Case numbers 24-1891 and 25-1077, Peng Guo v. Michigan Tech University, et al. Oral argument not to exceed 15 minutes per side. Mr. Farr, you may proceed for the plaintiff. Good morning. Good morning. May it please the court, I'm Brian Farrar on behalf of Dr. Peng Guo. I'd like to reserve five minutes rebuttal time. These consolidated appeals represent two chapters of the same story. One is where the district court prematurely dismissed viable claims of pay disparity and discrimination at summary judgment. And the other where the jury, having heard the actual evidence, properly found that Michigan Technological University discriminated against Dr. Guo with respect to her pregnancy. I'll begin by addressing the court's error in granting summary judgment on the constructive discharge, the Equal Pay Act, and the retaliation claims. And then, if I have time left before my rebuttal, I'll demonstrate why the jury's verdict in the second appeal should be upheld. The court granted summary judgment here on the record at oral arguments. There was no written opinion. A review of the transcript shows that the court made a number of fact-finding when dismissing the claims except for the pregnancy discrimination. The district court's grant of summary judgment here also was built upon a legal foundation that the Supreme Court has since dismantled. In dismissing Dr. Guo's constructive... One of the ways you correctly get by summary judgment is to have a pretty good comparator, you know, saying why this person versus that person. This is unusual because the spouse seems to be your best comparator, but the spouse did have additional training. So, I mean, what is your best case for a comparator where, you know, you can show the university was, you know, treating her differently? Your Honor, I think the comparator becomes most important on the pay disparity claim, the Equal Pay Act claim. And your Honor is correct. The spouse was the only comparator here. He was the only other assistant professor in accounting where she worked, and he was the best comparator. But didn't, I mean, didn't he have more experience? I mean, weren't there some objective explanations that would not have suggested gender discrimination? Well, and that's the dispute right there, is that the university did put forth some evidence that he had more publications than her, and that he had an extra year of teaching that she didn't have. And other teaching evaluations. That's, I believe, also in dispute, and I don't believe so much the teaching evaluations pertain to Dr. Eshelman, her spouse. There were other teaching evaluations were submitted in the record. But despite that evidence that we acknowledge was there, it's disputed. It's disputed that he had more publications? Well, not so much that he had more publications, but the university has admitted their policy is that they don't just look at the number of publications. They look at the overall quality, and we presented evidence that Dr. Goa's quality of publications were just as good, if not superior, to Dr. Eshelman's. And do we think that's something for juries to decide, whether, you know, your publication is better quality? I mean, I don't know how you're going to do that in a field like finance or nuclear engineering. Well, I believe it is a question for the jury, because it comes down to whether the university can prove that she was paid differently for some factor other than her sex. The Equal Pay Act is one of those unique statutes that places the ultimate burden, or the burden of approving the affirmative offenses, on the defendant. And in this case, the court found that on the pay disparity claim, the plaintiff, Dr. Goa, was paid less than the defendant. The plaintiff properly established a prima facie case. Then the burden turned to the defendant to prove its affirmative defenses, and while it certainly presented some evidence, as the court has acknowledged there, regarding the number of publications, the extra year of teaching, we believe we have put forth enough evidence such that the defendant can't actually meet its high burden of proving it. So on the claim on which you won state law pregnancy, I think Judge Neff thought it wasn't pled. It's pretty thin pleading, I would say. And so, I mean, what's your argument there that it satisfied the requirements for putting people on notice and so forth? Well, the word, there's no question in the complaint, it was count three that the plaintiff pled an Elliott-Larson claim under Michigan state law. But Elliott-Larson covers more than pregnancy, doesn't it? Correct. So why keep going? Well, correct. The word by my count, pregnancy, was mentioned five times in the amended complaint. In the fact section or the claim section? In the fact section. And maternity... Shouldn't it be required in the claim three, discrimination based on pregnancy? Why shouldn't that be just, that's not that big a request. Well, the heading of count three did state sex discrimination. I know. But my point is pregnancy. That's a distinct claim, as shown by this very case. Your Honor, I think that under the pleading standards here, the defendant clearly had fair notice that this was a pregnancy claim. Pregnancy was mentioned five times, maternity I believe was mentioned eight times in the factual section of the complaint. It was clear that we were repeating and re-alleging all prior allegations. That was right there at the top of count three. And there's this argument that... Maybe you can help me on Michigan law. Does Michigan law treat pregnancy discrimination and sex discrimination as the same claim? Yeah. Well, pregnancy is covered under the sex part of the Elliott-Larson. But is it considered doctrinally a separate theory is what I'm trying to figure out, or is it not? It's really considered one claim. I don't think it's considered doctrinally a separate claim. The courts have recognized that that falls under the prohibition on... Pregnancy discrimination falls under the prohibition on sex discrimination here. And I find the university's argument, which they only made in the days before trial, that they were unaware of the Elliott-Larson claim. I find it a bit disingenuous. We raised it in summary judgment. It was never addressed in their rebuttal. The plaintiff's summary judgment opposition brief made it very clear, pregnancy discrimination under Elliott-Larson, it was addressed. They did not mention it once in their reply and say, where is this coming from? We didn't know there was an Elliott-Larson pregnancy claim. That wasn't raised until in the days before trial when the magistrate judge issued his ruling and then the district judge granted the plaintiff's objections to the magistrate's ruling and the claim on pregnancy went before the jury on the Elliott-Larson claim. I'd also note, too... Did the jury get a state law sex discrimination claim instruction separate from state law pregnancy discrimination claim? There was a separate jury instruction on... If I recall, I know there was a separate jury instruction with respect to the Elliott-Larson and a separate one with respect to Title VII. I believe that off the top of my head that it would have mentioned pregnancy. That was the only claim that was being tried. The sex discrimination claim, the claim just generally that she was discriminated against because she was a woman, that claim never made it to trial. That was not presented to the jury. So all the evidence the jury heard was pertaining to her pregnancy discrimination claim. And I would also note in Judge Neff's, in her opinion on the record, granting in part summary judgment, she did refer to the pregnancy claims in the plural. She said the summary judgment is denied with respect to the pregnancy claims. So I think that, again, is further evidence that there was acknowledging both the Title VII and the Elliott-Larson claim. And at that trial, there was evidence of actual direct discrimination statements regarding maternity or pregnancy. Is that part of that trial, correct? Yes, Your Honor. That was the whole trial was whether or not she was discriminated against due to her pregnancy. There was no, the jury didn't, you know, we didn't present any evidence of other types of discrimination because, as the court's aware, the pay disparity, the constructive discharge claims, those were dismissed at summary judgment. Because I just have a few seconds left before my rebuttal, I do want to turn to this constructive discharge issue, because that gets to really the heart of what the plaintiff's damages were. We were not allowed to seek from the jury any type of economic damages beyond those that the jury could determine. Well, I don't have a, that would be up for the jury to determine. What are we talking about? Well, she's been out of work now. She took a part-time temporary position as an adjunct professor for a fraction of what her salary was. What's the ballpark that she's claiming, would have claimed? It would be several years of pay. It would be over a million dollars. Because she's currently now unemployed, this has had a devastating impact on her life. And if we look at the standards under the Supreme Court case in Muldrow, we believe the court applied the incorrect standard when finding that these other adverse actions did not constitute constructive discharge. All plaintiff needed to show here was that she suffered some harm in terms of the terms or conditions of her employment. But that was... Correct. It was not. But it talked about what constitutes an adverse employment action. And certainly when evaluating constructive discharge claims, we look at the aggregate of actions that took place to determine whether it rises to the level of a constructive discharge. By applying the wrong standard on what is and isn't an adverse action, we believe the district court then came to the incorrect conclusion that there was a constructive discharge. Thank you very much. We'll hear your full rebuttal. Thank you. A double header. Quite a practice for you. Good morning again, Your Honors. Thanks for having me here twice today. I'm Josephine DiLorenzo on behalf of defendants. We're asking that you affirm the district court's order as to summary judgment, but reverse the order denying our motion for judgment as a matter of law or new trial. There's a lot, so I'll just start. Let's talk through the pleading. It does seem hard to... Pleading is mainly notice, and it just seems hard to say that you were blindsided here. I believe, as Your Honor pointed out before, all the discussion of the pregnancy was in the facts section, and then the claims are just... But they did have this incorporation provision, which is pretty customary in complaints. I think customary to appreciate that point when you read a complaint. It was in there. I think what we were looking at is what Judge Neff said, and if you look at what she said on the record and then in her order, and she kind of said, well, it's kind of vague, but she started discussing Title VII, so there's a specific pregnancy claim under Title VII. And then if you look at the language of the order, it says gender discrimination claims plural were dismissed, but she said pregnancy discrimination claim singular was going on to the jury, so we're just going to rely on what she actually said. But yes, it was in the facts section of the... The word gender isn't that much of a clue as to anything, right? Well, we did point out that, of course, under Michigan law, sex does include pregnancy, but there's no definition of gender. They only talk about gender identity or expression, so... I mean, this day and age, you can use gender to refer to sex discrimination. Well, it's all very confusing. I mean, Justice Scalia and Justice Ginsburg would fight about this, but I don't think Justice Scalia would have said gender never concovers sex discrimination or pregnancy discrimination. Well, we were just... I guess, actually, these days, I don't know, it's kind of the definitions of everything are sort of in question, so we were just going by the plain language of the statute. But that wasn't the statute when she filed her claim. So gender identity is added to Elliott Larson two years, I think, after she filed her complaint. Okay. Well, then, I guess we just have this vague claim of sex discrimination that doesn't mention pregnancy. But I can... So I can just rely on what we said in the brief for that. Is there something else you want me to start with, or should I just plow right in? You can keep going. I mean, we're just asking questions. Okay. So I guess I could go back to the ruling on the summary judgment and the Equal Pay Act. And that is our position, that plaintiff and eshelman were paid the same at their hire date, but any differences were based on objective factors. So that would be differences in research and performance and their teaching scores. He says that they've put in facts contrary to that. What do you say in response to that? I think it's actually in the record that he had six published articles, and all of them were published after he started at the university. But by 2019, plaintiff had only published two peer review journal articles. I don't actually think that was in dispute. I think what they were trying to say is that plaintiff had... Well, they say that she had three articles pending review that were in higher quality journals. And so they're relying on the associate dean's testimony for that. But what she actually said is that unofficially, a higher rate of publication can count for more. But she emphasized that what the university considers continuous contribution of scholarly work. And that, I don't know if you'd say it's A-star or A-plus, but the A-star publication is not a substitute for the continuous publication. I think we did cite some cases... Counselor, I thought that there were statements that her publications were lesser than his because they were co-authored. But isn't it accurate that his were also co-authored? I didn't... So wouldn't that make them comparable? Well, that was one thing they said. I guess some of her articles were co-authored with her husband, but he still had more at the end of the day. And I think that in the university world, more accounts for more. Yeah, isn't it true that some of hers were... All of his that were co-authored were co-authored with her? And then he also had standalone articles? I know that hers were co-authored with him. I guess I don't know if he had others that were co-authored, but I guess he just had more. But yes, hers were all co-authored with his. That was the point that was brought out. And although he is the only comparator, they did mention several times in their briefing that... Her whole position is, I got the lowest raise. So if you look at it that way, and we only pointed it out because they made the argument, but if you look at it that way, accounting was one of the highest paid in the College of Business. So she was one of the highest paid people. As far as the constructive discharge, there's a specific allegation for that under the discrimination. But under both federal and state law, you have to show that the employer deliberately created intolerable working conditions that would compel a reasonable person to resign. So she's got a whole list of things. But starting out, if you look at her raises, she got raises every year. So even if they're not as high as she subjectively thought they should have been, she's still getting annual raises. So I don't see how that can be a characteristic of an intolerable working condition, or an indication that they wanted her to quit. Isn't there testimony from Howard Quig? I'm not sure I'm pronouncing it correctly. Regarding the common knowledge in academic communities, that if the dean speaks against you at your fourth year review time when you are in the tenure track, that that means you're not going to get tenure and you're going to be released. You will be let go. I think, yes, there was testimony from that professor and also from her husband along the same lines. However, I think you have to look at the objective evidence. I think that contradicts the objective evidence, which is, first of all, in the joint statement of facts, it says that each major review provides constructive feedback on a professor's performance. And that was constructive feedback. At the end of the day, the dean, in fact, recommended her for a two-year contract renewal. So if he didn't want her to make tenure, he didn't have to go through this charade. She admitted that he could have given her a one-year terminal contract. That's what they do if they don't want someone to make tenure. They don't try to fake them out so that at the end of that two-year period, then they're in trouble with not having a job. Are you challenging the sufficiency of the evidence for the jury verdict? I was speaking about that for the summary judgment. But did you want me to go ahead to the trial? Yes, we're saying that she failed to establish an adverse action. And then regardless, she didn't show that any adverse action that was talked about at trial was because of unlawful pregnancy discrimination. And so under Michigan law, an adverse action for a discrimination claim has to be materially adverse. It's typically an ultimate employment decision. And so Michigan courts say the ultimate question is whether the plaintiff is a victim of intentional discrimination. And they say that's interpreted as a requiring but for causation or causation in fact. Plaintiff said that there was a distinction between the standard at the trial stage versus... What do you do with the testimony about Johnson's statement? Well, I think so. What she's saying that he said is that when she went in in 2018 and why did I get this low raise? And he said, it's because you took maternity leave and you didn't do enough service. But I think it was focused on, well, you didn't do service. So that goes to the whole, was she supposed to do service during her maternity leave? It was unclear. He was unclear on the policy. I don't think that's not evidence of intention. It's not evidence of intention. It does seem like evidence of intention. Well, no, because he thought there was dispute over... I think there's definitely testimony from more than one person that says it was confusing about what the policy actually required. So he thought she was supposed to do service, but then at the end of the day, no, maybe she wasn't supposed to do it. But her service overall, even before that, I believe was lacking. But isn't the problem what he attributed that to? There is a difference because you took maternity leave. That seems to me direct evidence. You could look at it that way, but then I would also say... If you could look at it that way, then we have the problem that the jury could have looked at it that way. Well, I would still say that she didn't present evidence that she should have gotten a higher raise regardless, because she got a 1.13% raise, and she conceded that a 1% raise was meets expectations. So she's still getting higher than the meets expectation. Are you really going to go down this road? Could a school really have a policy where we're distinguishing and raises? One group gets 3%, and everyone that takes maternity leave or even paternity leave gets 1%? And the 1% quote meets expectations? I can't imagine that's even close to okay. So I guess the dispute is, okay, so what he supposedly said was you didn't do enough service during your maternity leave. But that was just one part of it, the service. It was all the other factors too, the publications and all those areas where they're evaluated on. He said the causal reason is because you took maternity leave or because you didn't do enough service during your maternity leave. He said this is the thing that made the difference, was the fact that you took three months off. Well, there was still other evidence. I mean, that was her testimony of what he said. But a jury could just believe that? They could, but I still think it's just subjective that her raise should have been higher based on all those other factors. I mean, she still was comparing herself to people that had more publications, more experience. And even her husband, still the focus is on the publication. So they got the same raise the first year, and then after her maternity leave, he still had more publications. So that's going to explain why he got more. He's still the only person that we're comparing her to. And then, let's see, I can just quickly go on to our new trial issue, which was, we had the summary judgment ruling that all those things didn't amount to adverse actions. And so that's why summary judgment was denied. So all we have now is this pregnancy discrimination claim. But we still heard about all those other things. So the focus of the trial should have been limited to the purported adverse actions, which was the lower raise. And then I believe the second thing was the stipend. So the district court's reasoning was, well, all this other testimony can come in because it's relevant to the issue of discriminatory animus, as well as her economic damages. But the discriminatory animus was supposed to be related to her pregnancy. And so, again, under Michigan law, she was required to prove discrimination because of her pregnancy, not because of some vague bias. So letting all these other things in led the jury to decide on an improper basis. And a lot of the things that came in, all those other things, were well after her pregnancy. I mean, several of those things happened two years after she had the baby. So in that sense, they were allowed to decide on several irrelevant things that happened. And I guess that's all I have, unless you have any other questions.  May I proceed?  Your Honor, with respect to the pay disparity claim, the Equal Pay Act, I just want to remind the Court again of the language that this Court has used in the past, the Supreme Court has used, that the defendant has a high burden of proving its affirmative defenses. And while there's been a lot of testimony today that Dr. Eshelman's may have published more, had more publications, that doesn't necessarily mean they've met that high burden of proving that that was the reason why he was paid more. The plaintiff has put forth evidence that while Dr. Eshelman may have had more publications, hers were of better quality. I realize... And there's testimony from the Associate Dean that those are counted as well. They're taken into consideration. They look at the full picture of a professor's, of their publications when determining whether someone has met the requirements or not. There's testimony that Dr. Eshelman had an extra year of teaching, but as we noted in the briefing... This is just an excellent unfinished article. It can be one of many factors. They do consider some publications take a lot more time to be reviewed than others. It's a long process. So when I asked the Associate Dean about this at her deposition, she was very clear that they look to see what's in the pipeline. A professor might have had some outstanding publications in the past but has not done anything recently, that's going to be weighed against them. On the other hand, if they are actively in the process and final stages of a... Was that the situation, like they had already been accepted and people were just doing edits and all? That's my understanding. In hers, particularly the A-star publication, the one that's the most prestigious in accounting, it had been in its final... It had already been preliminarily accepted and it was being reviewed for final publication. That's my understanding, which is often considered in academia the same... Did it get published? I believe it did, but I'm not certain off the top of my head, because this was a long time ago. But I believe it eventually did get published. I also want to turn to Dr. Eshelman's additional year of teaching. We noted in the briefs that he had the exact same starting salary and the same tenure clock. And there's evidence in the record that when someone joins and they have relevant teaching experience, they get an accelerated clock. So we can assume that that was not a factor in his higher pay, because if they felt that way, the university would have given him accelerated tenure clock. I think what's... On the fact that her offer was conditional on him accepting the offer, but his was not conditional on her accepting the offer, doesn't that show that the university valued him more as a faculty member? And not because of sex, I mean, because of these other things? I can't speak for why they did that. My understanding is it's not uncommon when you have spouses who join institutions to have it be contingent on one or the other joining. But that is not an excuse for discrimination. Even if they initially felt that he was a bigger catch than she was to get into the university, that doesn't mean that they can treat her differently because of her sex or because of some other factor. I think the constructive discharge claim here is important because... What's your response to the point she's getting raises? I mean, I'm not minimizing the other claims, but I thought that was you're being forced out. That seems very funny to say about someone who's still getting a raise. And the difference is 1%. I mean, I would say the others must have felt close to constructively discharged because they were getting, what, two points something? They varied. Some were higher, but at that institution, nearly everybody, if not everyone, got raises. I don't think there was evidence that there was anyone who did not get a raise. That suggests they're not constructively discharging anyone. My take is just to kind of agree with the point. That seems like a funny thing to say. I think giving someone a raise doesn't necessarily disprove constructive discharge in this particular setting. Now, at other jobs it might be different. Academia is sort of a unique scenario here. And what might constitute... Is that what you mean? No, not necessarily. But I think what actions might not have caused a reasonable person to leave one job, those same actions might have caused someone else in a different scenario to leave. And we've identified through... Workplace conditions are so intolerable that you are forced to leave? That's the standard that the courts have used. I don't think it applies perfectly in this situation. Because the overall standard, too, is what would a reasonable person do in this situation? Is that the standard? Or is the standard, is the workplace so intolerable that a reasonable person would choose to leave? That's the way it's always been articulated. And I think they're read together, that's correct. And here we have a situation where accepting as true, for purposes of summary judgment, Dr. Goua's testimony and the testimony of others, that she had a very slim chance of obtaining tenure, and that had she stayed and not gotten tenure, it would be devastating on her career. Accepting that as true, then I think a jury could find it absolutely reasonable for someone in her position to leave a job. I think that's really the critical issue here that the district court erred in. So what you're saying is deans have to make tenure decisions at that fourth-year review. They have to decide to put you on a one-year terminal contract. Because if they don't, if they think it's a redeemable case, and then ultimately you don't, then ultimately you're on the hook as if you fired them, even though you didn't fire them. Well, they call it the major review for a reason, because I believe oftentimes that's when a decision is made. It hasn't necessarily been formalized, but it becomes clearly conveyed to the candidate whether they're going to make tenure or not. And this is spelled out in... It was a four-year tenure clock, not a six-year tenure clock. Well, I think there are different ways to look at it. A lot of professors would say it's really a four-year clock, because if you don't have, by your major review, if you're not on good terms with your dean and you don't have the support of your dean, the chances of making tenure are extremely rare. Thank you.